**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

|  |  |  |
|---|---|---|
| ANTHONY ROBINSON<br>102 White Oak Road<br>Cherry Hill, New Jersey 08034 | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. _____ |
| YES& HOLDINGS, LLC<br> a/k/a YES& AGENCY<br>1700 Diagonal Road<br>Alexandria, Virginia 22314 | ) ) ) ) ) | |
| Serve:  United Corporate Services, Inc.<br>         7705 Yolanda Road<br>         Richmond, Virginia 23229<br>         Registered Agent | ) ) ) ) ) | |
| Defendant. | ) ) ) | |

## COMPLAINT

COMES NOW THE PLAINTIFF, ANTHONY ROBINSON, by counsel, and moves this Court for entry of judgment in his favor, and against the Defendant, YES& HOLDINGS, LLC a/k/a YES& AGENCY, and in support of such motion alleges and avers as follows:

## NATURE OF ACTION

This action states claims for discrimination and hostile work environment based on Plaintiff's race, in the course of, and in the termination of, Plaintiff's employment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.* and the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*, and pursuant to 42 U.S.C. § 1981.

This action also states a claim for breach of contract against the Defendant, Yes& Holdings, LLC a/k/a Yes& Agency.

## PARTIES

1.     Plaintiff Anthony Robinson ("Mr. Robinson") is a resident and citizen of the State of New Jersey.  At all times relevant hereto, Mr. Robinson was employed by the Defendant, in this judicial district.

2.     Defendant Yes& Holdings, LLC (also known as Yes& Agency) ("Yes&") is a domestic (Virginia) limited liability corporation in good standing, headquartered in the City of Alexandria, in this judicial district.

3.     Yes& is an independent marketing agency serving clients in a variety of sectors, including commercial, association, B2G, higher education, not-for-profit, and government.

4.     Mr. Robinson was an "employee" of Yes& within the meaning of 42 U.S.C. § 2000e(f).

5.     Yes& is an "employer" within the meaning of 42 U.S.C. §2000e(b).

6.     Yes& has had 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and was Mr. Robinson's "employer" within the meaning of Va. Code § 2.2-3905.

7.     Yes& has had more than 100 employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, within the meaning of 42 U.S.C. § 1981a(b)(3)(B).

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over Mr. Robinson's claims under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e, *et se*q.

9.     The amount in controversy in this action exceeds the jurisdictional minimum amount for this Court.

10.     Yes& is headquartered in and regularly conducts business in this judicial district.

11.     The causes of action alleged in this action arose or originated within the Eastern District of Virginia.

12.     The unlawful employment practices committed by Defendant caused injury to Plaintiff in this judicial district, Plaintiff was employed in this judicial district, Yes& conducts business in in this judicial district, and Mr. Robinson would still be employed in this judicial district but for the unlawful practices of the Defendant.

13.     Venue over Plaintiff's claims is proper in this Court pursuant to 28 U.S.C. § 1331 and 1343(4).

14.     Jurisdiction and venue are proper in this Court.

## PROCEDURAL STATUS

15.     Me. Robinson timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about September 26, 2024.

16.     The EEOC issued a Right to Sue on March 20, 2025.

17.     This action is timely filed.

## BACKGROUND

18.     On November 1, 2021, P'unk Ave, a 25-person digital agency, was acquired by Yes&, a 180-person agency.  Mr. Robinson was CEO of P'unk Ave at the time, with 3% ownership.

3

19.     As a result of the acquisition, on November 1, 2021, Mr. Robinson entered into an Employment Agreement with Yes& for the position of Senior Vice President, Digital Strategy, reporting directly to Jeb Brown ("Mr. Brown"), Chairman and COO of Yes&.

20.     Pursuant to the Employment Agreement, the Term of Mr. Robinson's employment was as follows:

> **Term**. Subject to the provisions contained in Sections 6 and 7, the Executive's employment pursuant to this Agreement by the Company shall be for a term commencing on the Effective Date and expiring on the close of business on March 31, 2024 (the "**Initial Term**"); provided, however, that if, on or before December 31, 2022, the parties mutually agree to extend the Initial Term, the Initial Term shall be extended to December 31, 2025; and further provided, that the Executive's employment by the Company shall continue for an indefinite period after the conclusion of the Initial Term unless and until either Party shall give to the other 90 days' advance written notice of termination (a "**Notice of Termination**") specifying the termination date, which shall not be less than ninety (90) days after the date on which the Notice of Termination is given.

21.     Also on November 1, 2021, Mr. Robinson was asked to sign a Protective Covenants Agreement as a condition of employment.

22.     In his role as SVP, Digital Marketing at Yes&, Mr. Robinson maintained his role as the head of digital, but shared his responsibilities with another executive, Tracy Betts ("Ms. Betts"), who came to Yes& from another small firm that had been recently acquired by Yes&. Mr. Robinson also maintained his prior level of compensation, and in addition, received Long Term Incentive Plan shares from Yes& which vested yearly.

23.     Yes& has an aggressive mergers and acquisitions strategy, and a track record of acquiring smaller firms and asking employees who wish to remain employed to quickly sign new employment agreements and restrictive covenants, with minimal time to review.

24.     Mr. Robinson was given less than four days to review and sign his agreements, a concern he communicated in writing to Yes& leadership.

4

25.    From the start of his employment with Yes&, until Robb Lee joined Yes& as a Senior Vice President approximately 2½ years later (in August 2023), Mr. Robinson was the only African-American executive.

26.    After the acquisition, Mr. Robinson lost most of his former staff, and worked to rebuild the digital team from scratch.  Mr. Robinson received an increase in his compensation during this time.

27.    The core executive team group was expected to be the face of the company. In terms of tasks and responsibilities, they each had similar expectations to run their respective departments and manage their direct reports. However, when it came to things Mr. Brown deemed as "serious" (such as acquisition conversations or sub-committee assignments), Mr. Brown would not even mention these things to Mr. Robinson or include Mr. Robinson in meetings.  It was clear that certain people (*i.e.*, Caucasian members of the executive team) knew more than others and that Mr. Robinson was not "in the know."

28.    In addition, Caucasian executives would travel across the country to meet other potential partners or executives, or vet a new service. Even if the service or partnership fell directly under Mr. Robinson's area of expertise (digital/higher education/non-profit), Mr. Brown would not send Mr. Robinson. However, if the opportunity arose where introducing Mr. Robinson to a potential partner was beneficial from a racial standpoint, then Mr. Brown would present Mr. Robinson to the client or potential client – as if to put on display the fact that Yes& had a Black executive.  This happened several times.

29.     In 2022, Yes& had the potential to win a huge account with the US Mint. The US Mint wanted a fresh perspective for selling specialized coins and wanted to expand the base of its customers to BIPOC (Black, Indigenous, and People of Color), LGBTQ+, and younger generations.

30.     The pitch team, led by CEO Robert Sprague ("Mr. Sprague") (Caucasian), tapped Mr. Robinson and Louis Maldonado ("Mr. Maldonado") (Latino) to represent their perspective on advertising to diverse audiences.  Mr. Robinson and Mr. Maldonado presented their pitch to the client and won the account, which was an enormous win for Yes& at the time. It was another huge federal contract worth over $1,000,000+ annually.

31.     During the course of working with Mr. Maldonado, Mr. Robinson learned that he was a minority shareholder (as Mr. Robinson had been at P'unk Ave) in a company that was considering partnering with Yes&, such that Yes& would own approximately 40% of the company.

32.     After Yes& won the project as a result of the pitch by Mr. Robinson and Mr. Maldonado, Mr. Maldonado and Mr. Robinson were not invited to the account to participate in servicing the client. In fact, after winning the work, it became apparent to the US Mint account team that it was completely missing the inclusive perspective and strategy created by Mr. Robinson and Mr. Maldonado.

33.     This happened on other occasions as well. Then, when the account suffered, they would reach out to Mr. Robinson, Mr. Maldonado (or other people of color at Yes&) to be added to the account.

34.     Mr. Maldonado and Mr. Robinson pitched several things together after that but because of this experience with Mr. Brown, which was insulting and discriminatory, Mr. Maldonado recommended to his fellow shareholder partners that they should not proceed with the acquisition by Yes&.  Mr. Moldonado (justifiably) felt that Mr. Brown was using him (and Mr. Robinson) to position diversity to clients without actually investing in the business or having any real interest in what they do.

35.     Mr. Robinson's team began to win some large projects, which allowed the team to continue to grow and expand.  In the July/August 2022 timeframe, Mr. Robinson's team won its landmark project.  However, it soon became clear that having two "heads" of the digital department (Mr. Robinson and Ms. Betts) was not sustainable, and oftentimes created conflict.

36.     Eventually, Mr. Brown told Mr. Robinson that he only wanted "one hand on the steering wheel" for decision-making for the digital department and he had chosen Ms. Betts over Mr. Robinson to handle that responsibility. Ms. Betts is Caucasian.  Ms. Betts was not as qualified or experienced for the role as Mr. Robinson was, and should not have been selected over him.

37.     Although this was not a financial "demotion" it was still a demotion to Mr. Robinson, and was viewed as such by his team and colleagues, because all of Mr. Robinson's direct reports began reporting to Ms. Betts.

38.     There was no justification for removing Mr. Robinson's supervisory authority, as he had always been a top performer, and had never been disciplined or counseled for any performance based reasons or his leadership style.  To the contrary, Mr. Robinson was often lauded for the large wins and innovative ideas that helped give Yes& more credibility in the brand and digital space.

7

39.    Therefore, after Mr. Brown announced his decision to effectively promote Ms. Betts over him, Mr. Robinson asked to meet with Mr. Brown.  The outcome of that discussion was for Mr. Robinson to transition to a compensation structure that recognized his sales performance and rewarded his new focus on digital new business and accounts.  The new structure provided for an approximate bi-annual performance bonus worth a maximum of $15,000 - $20,000 for each half of the year.

40.    In October 2022, Mr. Robinson received another raise, after Mr. Brown accidentally sent him (and two other employees) a profitability spreadsheet containing salary information, and Mr. Robinson learned that not only was he the lowest paid executive, but there were even non-executives earning more than he was.  This only served to verify what Mr. Robinson had already been feeling – that he was being treated differently, and marginalized, and this just confirmed it.

41.    After he saw the information, Mr. Robinson was given a raise in an effort to bring his compensation in line with his Caucasian counterparts, but this would not have occurred if Mr. Brown had not inadvertently sent Mr. Robinson the salary information.  Even after his raise, the pay difference between Mr. Robinson and Caucasian executives was still about $35,000.

42.    Despite knowing that Yes& valued him less and had paid (and continued to pay) him less than my Caucasian colleagues (including some at a level below him), Mr. Robinson continued to launch new programs and make significant strides for Yes& in bringing in new clients. However, he often felt like "window dressing" – as if he was being brought out just so Yes& could give the appearance of supporting diversity.

43.    As of August, 2023 it became apparent that Mr. Brown had made the wrong decision in appointing Ms. Betts as head of digital, and Ms. Betts was asked to step down from

her position. She ultimately departed Yes&, and by September 2023, Mr. Robinson had re-assumed the role as head of digital.

44.     The problems left in the wake of Ms. Betts' departure, including the work culture and personnel issues, were significant, and Mr. Robinson made it his priority to rectify those issues, and win digital projects that would help define the agency. He succeeded.

45.     Tactically, Mr. Brown's motivation for engaging with minorities in minority owned businesses was to move Yes&'s FEMA account to that business because the FEMA account was based on a small business federal vehicle and Yes& was too big to recompete the business in 2025.

46.     In 2023, Mr. Robinson was introduced to Janelle Coy ("Ms. Coy") and her company, Spero.  Mr. Brown thought it would be a good idea if Mr. Robinson and Ms. Coy worked together – seemingly because they are both African-American/Black.

47.     In late March or early April 2024, Mr. Robinson met with Mr. Brown and communicated his desire to own his own agency, asking for the support of Yes& to achieve that goal.

48.     Mr. Robinson described his vision of his agency – The Devoted Agency - and Mr. Brown expressed his excitement to support Mr. Robinson in that endeavor.  In fact, Mr. Brown expressed interest in investing or even becoming a minority partner.  However, they agreed that Mr. Robinson could start up The Devoted Agency and run it concurrently with his duties at Yes& (reducing his Yes& time to four days each week), and they would "see how things go," reassessing on a month to month basis, to ensure Mr. Robinson's responsibilities at Yes& were being fulfilled.

49.     In May 2024, Yes& announced the imminent hire of a new COO, Zihla Silinas ("Ms. Silinas") (Caucasian) to replace Mr. Brown, who wanted to exit by the end of 2024.  At the same time, it was announced that Yes& was identifying potential partners for a strategic acquisition, minority sale, or ESOP to assist with the owner's exit.

50.     During a meeting with Ms. Silinas at the beginning of June 2024, Ms. Silinas asked about Mr. Robinson's 30hr/week agreement and suggested they "figure out a plan" for his exit.  Mr. Robinson responded that he was not interested in making a full exit at that time because of the announcement of the sale, and stated that he would continue to fulfill his responsibilities until (at a minimum) the conclusion of the sale.

51.     Mr. Brown, who was also present, responded, "Don't worry Anthony, we are going to take care of you no matter what. Before or after the sale. Let's just figure this out."

52.     During the week of June 15, 2024, Mr. Robinson was summoned to a 1:1 meeting with Ms. Silinas at which time she notified Mr. Robinson that Yes& had learned that his colleague and co-worker, Nicole Glueckert was working at Mr. Robinson's new company – The Devoted Agency – and because of that, Mr. Robinson was in violation of his non-solicitation agreement with Yes&.

53.     Ms. Silinas offered Mr. Robinson two options: 1) termination For Cause (for his alleged violation of his non-solicitation provision); or 2) removal from the Executive Team and with status as a consultant working on new business and continuing to work his current clients for 15-20 hours/week @ $125/hr., with payment of half of his performance bonus ($7,500) and payout of his LTIP shares ($6,250).

54.     Mr. Robinson declined to accept either of the options presented to him, and shortly thereafter, provided a rebuttal to Yes&'s position.

10

55.    After that, on June 28, 2024, Mr. Robinson received notice of his termination via email. The email notice purported to terminate his employment without notice or severance, in violation of the terms of his Employment Agreement.

56.    The termination notice incorrectly stated that the term of Mr. Robinson's employment expired on March 31, 2024 because "there was no mutual agreement to modify of extend it."

57.    However, rather than terminating on March 31, 2024, the Employment Agreement states in Section 2t:

> [T]he Executive's employment by the Company shall continue for an indefinite period after the conclusion of the Initial Term unless and until either Party shall give to the other 90 days' advance written notice of termination (a "Notice of Termination") specifying the termination date, which shall not be less than ninety (90) days after the date on which the Notice of Termination is given.

58.    Yes& did not provide, and Mr. Robinson did not receive, ninety (90) days' notice of his termination.  In fact, Mr. Robinson did not receive *any* notice, and he was summarily fired and locked out of all company systems.

59.    The termination email notice also attempted to assert that Mr. Brown nd Mr. Robinson "modified" the Employment Agreement with new terms. This is demonstrably false, as per the terms of the Employment Agreement, any modification was required to be in writing and approved by the Managing Member of the Company (or a Designated Officer).

60.    Specifically:

> This Agreement may not be orally canceled, changed, modified or amended, and no cancellation, change, modification or amendment, or waiver of any rights shall be effective or binding, unless in writing and signed by the Parties to this Agreement, and approved in writing by the Managing Member or the Designated Officer.

61.    Mr. Robinson is not aware of any such writing – because none exists.

11

62.     Prior to his improper termination, Mr. Robinson had discussed his transition to his new agency, The Devoted Agency, and Yes&, through Mr. Brown, had agreed to support this transition.  Indeed, Yes& requested that Mr. Robinson make several joint proposals for client work, and announced its support for this endeavor in writing to Yes& employees.

63.     While conversations were ongoing about when Mr. Robinson might make a full transition, Mr. Robinson continued to perform all of his duties, and the only formal understanding was a reduction to a four day per week schedule. Mr. Robinson and Yes& had not agreed upon or memorialized a date on which Mr. Robinson's Employment Agreement with Yes& would terminate, and had not agreed upon or memorialized any other modifications to the Employment Agreement.

64.     In addition, upon any termination other than For Cause, as defined in the Employment Agreement, Mr. Robinson is entitled to the severance benefits provided under Section 7(b) (six months).

65.     The termination notice provided by email on June 28, 2024 does not assert that Mr. Robinson was terminated For Cause.

66.     Notably, on the day of his termination, Mr. Robinson reminded Yes& that should it believe (even incorrectly) that he had somehow violated an obligation to the company or otherwise violated any other provision of the terms of his employment, Yes& was required to provide him with fourteen (14) day's written notice specifying in reasonable detail the nature of the claimed breach and the manner in which the company required such breach to be cured.

67.     Such a notice and opportunity to cure was not provided, and under Section 6 of Mr. Robinson's Employment Agreement, Yes& cannot effect a termination for Cause, as defined therein, without complying with this Section.

68.     This notice and cure provision expressly applies to any alleged violation of the non-solicitation obligations set out in Section 8(b)(iii), pursuant to the terms of Section 6(a)(vii).

69.     In addition, Mr. Robinson also gave notice to Human Resources on June 28, 2024, that if there was any concern regarding his work with The Devoted Agency, which had previously been approved, he would work to address and cure whatever concerns the company had.

70.     As a result of the foregoing, Mr. Robinson is entitled to payment for the ninety (90) days' notice period and to the severance benefits (six months of his base salary) provided under Section 7(b) of this Employment Agreement.

71.     In addition, Mr. Robinson was due to be awarded his performance bonus on July 1, 2024 – the first business day after his termination.  As of that date, Mr. Robinson had completed up to $20,000 of that performance bonus.

72.     Mr. Robinson also would have received a LTIP bonus at the end of the year. According to the shares, this was estimated to be somewhere between $5,000 - $6,500 depending on the valuation of the shares which is dependent on EBITA.

73.     On the day of his termination, Mr. Robinson shared his desire for a mutually satisfactory path forward that would comport with the terms of his Employment Agreement. Therefore, Yes&'s subsequent actions appear to be a premeditated effort to terminate Mr. Robinson's employment prior to the upcoming sale in order to avoid having Mr. Robinson share in the rewards of his efforts.

74.     The fact that Yes& has also breached the terms of the Asset Purchase Agreement ("APA") for the Merger, including by failing to provide Mr. Robinson with the Earnout Statements required under Section 2.5, despite his request for this information, and taking other

steps inconsistent with the parties' agreement post-Merger; strongly suggest that these actions were undertaken in order to avoid paying out that portion of the Purchase Price owed Mr. Robinson and his previous partners arising from the Earnout Period calculations.

75. The reason given for Mr. Robinson's termination was pretextual, and a sham, and was designed to cover up the true and discriminatory reason for his termination.

76. In addition to the above, Yes& has demonstrated a pattern and practice of discriminating against its African-American/Black and other minority employees.

77. Rynnel Laughlin ("Ms. Laughlin") (African-American/Black), VP Account Management, and Mr. Robinson had many conversations wherein she expressed feeling devalued, and "othered" (not being accepted or fitting in at the company), and positioned within the company because of her race and gender. After Mr. Robinson's termination, Ms. Laughlin was immediately put in front of a client because the potential client reacted poorly to Mr. Robinson's termination. This was a sensitive account that dealt directly with racism, and Ms. Lauglin was presented to the client even though her skill set was not well suited for the account. Ms. Laughlin knew what was happening, and said it made her feel like a "tap-dancing Negro."

78. In April/May 2024, Celeste Morrison ("Ms. Morrison"), a transgender woman, was hired as VP of Engineering. After she was hired, it became clear that Mr. Brown did not like her. Mr. Brown made comments (more than once) that, "We have to be careful because she is a Maverick [on the Predictive Index Behavioral Assessment designation] and they don't make good leaders. We need to watch out for her. She's a trouble-maker." Ms. Morrison had only been employed for four weeks when Mr. Brown labeled her a "trouble maker," and "not a good leader," and cautioned others to "watch out" for her.

14

79.     In sharp contrast, three Caucasian senior executives also received "Maverick" designations and they were some of the highest paid individuals at the company. Yes& used the PI test to hire/fire people based on their cognitive tests and if they do not fit into the company. Mr. Brown did not issue a warning that the other, non-minority executives who were also "Mavericks" were "trouble makers," not good leaders, or that others should "watch out" for them.

80.     Mr. Brown often referred to Ms. Morrison as a "he/she," a "him," a "dude woman," or "whatever else the hell they want to be called." He did not attempt to hide his dislike for her, and ignored Mr. Robinson's advice/ pleas to use her proper pronouns. The same week Mr. Robinson was told she needed to be fired, he had just written her 30 or 60 day review which was an overall very positive review.  However, Mr. Robinson was instructed not to submit her review to HR because that would make her firing "problematic."  Mr. Robinson reported this to HR.

81.     Brianna Lawson (African-American/Black/LGBTQ+) was a senior copywriter, specially assigned to the US Mint account. Yes& assigned her to that account to demonstrate diversity.  While working on the account, a member of the client team made several homophobic remarks (witnessed by other Yes& employees).  Despite learning about the incidents, Yes& took no action to support Ms. Lawson, or address it with the client, and Ms. Lawson was forced to remain on the account.

## COUNT ONE - 
## DISCRIMINATION AND HOSTILE WORK ENVIRONMENT 
## DURING THE COURSE OF EMPLOYMENT AND IN THE 
## TERMINATION OF EMPLOYMENT IN VIOLATION OF TITLE VII

82.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

15

83.    Defendant discriminated against Mr. Robinson, treated Mr. Robinson in a disparate manner, subjected Mr. Robinson to a hostile work environment, and ultimately terminated Mr. Robinson, based on his race (African-American/ Black).

84.    Acts of discrimination include:

- Excluding Mr. Robinson (the only Black/African-American executive for the first (approximate) two years of his employment with Yes&) from conversations and meetings about significant issues such as acquisition conversations or sub-committee assignments which directly impacted his department;

- Tasking Caucasian executives with business travel to meet potential partners or executives, or to vet a new service, instead of Mr. Robinson, even if the partnership fell directly under Mr. Robinson's area of expertise;

- Presenting and introducing Mr. Robinson to potential clients partners only when it benefited the company from a racial standpoint – if Yes& wanted to "display" a Black executive (such as tasking Mr. Robinson to work with Spero/Janelle Coy, seemingly because Mr. Robinson and Ms. Coy are both African-American/Black);

- Tapping Mr. Robinson and another minority, Louis Maldonado, to lead the pitch for the US Mint account which wanted to expand the base of its customers to BIPOC, LGBTQ+, and younger generations, and then shutting Mr. Robinson (and Mr. Maldonado) out from servicing the client after they won the account for Yes&;

- Adding Mr. Robinson (or other employee of color) to an account only after an account suffered or a client complained about the lack of diversity or inclusivity;

- Choosing Ms. Betts (Caucasian) over Mr. Robinson to lead decision making for the digital department after the team won a landmark project, even though Mr. Robinson was more qualified and experienced for the role (and ultimately had to take it over and fix the problems created by Ms. Betts when Ms. Betts was asked to stop down);

- Effectively demoting Mr. Robinson by removing his supervisory authority when his direct reports all began reporting to Ms. Betts;

- Paying Mr. Robinson (the only Black executive at the time) the lowest salary of all the executives;

- Paying Mr. Robinson less than some Caucasian non-executive employees;

- Giving Mr. Robinson a raise in an (alleged) effort to bring him in line with his Caucasian counterparts, which still left him earning approximately $35,000 less than his Caucasian counterparts;

- Ms. Silinas telling Mr. Robinson they would "figure out a plan" for his exit when Mr. Robinson had expressed no desire to fully exit; and

- Terminating Mr. Robinson's employment.

85.    Non-African-American/Black employees were not subjected to similar treatment.

86.    In addition to the above, Yes& has demonstrated a pattern and practice of

discriminating against its African American/Black employees, and other employees of color.

- Rynnel Laughlin (African-American/Black), VP Account Management, told Mr. Robinson she felt devalued, and "othered" (not being accepted or fitting in at the company), and positioned within the company because of her race and gender.

- After Mr. Robinson's termination, Ms. Laughlin was immediately put in front of a client because the potential client reacted poorly to Mr. Robinson's termination. Ms. Laughlin knew what was happening, and said it made her feel like a "tap-dancing Negro."

- In April/May 2024, Celeste Morrison, a transgender woman, was hired as VP of Engineering. Mr. Brown made comments (more than once) that, "We have to be careful because she is a Maverick [on the Predictive Index Behavioral Assessment designation] and they don't make good leaders. We need to watch out for her. She's a trouble-maker."  In sharp contrast, three Caucasian senior executives also received "Maverick" designations and they were some of the highest paid individuals at the company.  Mr. Brown did not issue a warning that the other, non-minority executives who were also "Mavericks" were "trouble makers," not good leaders, or that others should "watch out" for them.

- Mr. Brown often referred to Ms. Morrison as a "he/she," a "him," a "dude woman," or "whatever else the hell they want to be called." The same week Mr. Robinson was told Ms. Morrison needed to be fired, he had just written her 30 or 60 day review which was an overall very positive review, but he was instructed not to submit her review to HR because that would make her firing "problematic."

- Brianna Lawson (African-American/Black/LGBTQ+) was a senior copywriter, specially assigned to the US Mint account to demonstrate diversity.  While working on the account, a member of the client team made several homophobic remarks (witnessed by other Yes& employees), but Yes& took no action to support Ms. Lawson, or address it with the client, and forced her to remain on the account.

17

87.    Defendant's discriminatory treatment of Mr. Robinson violated Title VII of the Federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

88.    In discriminating against Mr. Robinson in violation of federal law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Mr. Robinson.

89.    Each of the above acts constitutes discrimination and created a hostile work environment.

90.    As a direct and proximate result of Defendant's actions, Mr. Robinson has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, emotional distress, fearfulness, stress, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

91.    Due to the conscious disregard for Mr. Robinson's federally protected rights, and the severity of Defendant's conduct, Mr. Robinson is also entitled to punitive damages.

**COUNT TWO –
DISCRIMINATION AND HOSTILE WORK ENVIRONMENT
IN THE COURSE OF EMPLOYMENT AND IN THE
TERMINATION OF EMPLOYMENT IN VIOLATION OF THE
<u>VIRGINA HUMAN RIGHTS ACT/VIRGINIA VALUES ACT</u>**

92.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

93.    Defendant discriminated against Mr. Robinson, treated Mr. Robinson in a disparate manner, and subjected Mr. Robinson to a hostile work environment because of his race

18

(African-American/Black), in violation of Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

94. Acts of discrimination include:

- Excluding Mr. Robinson (the only Black/African-American executive for the first (approximate) two years of his employment with Yes&) from conversations and meetings about significant issues such as acquisition conversations or sub-committee assignments which directly impacted his department;

- Tasking Caucasian executives with business travel to meet potential partners or executives, or to vet a new service, instead of Mr. Robinson, even if the partnership fell directly under Mr. Robinson's area of expertise;

- Presenting and introducing Mr. Robinson to potential clients partners only when it benefited the company from a racial standpoint – if Yes& wanted to "display" a Black executive (such as tasking Mr. Robinson to work with Spero/Janelle Coy, seemingly because Mr. Robinson and Ms. Coy are both African-American/Black);

- Tapping Mr. Robinson and another minority, Louis Maldonado, to lead the pitch for the US Mint account which wanted to expand the base of its customers to BIPOC, LGBTQ+, and younger generations, and then shutting Mr. Robinson (and Mr. Maldonado) out from servicing the client after they won the account for Yes&;

- Adding Mr. Robinson (or other employee of color) to an account only after an account suffered or a client complained about the lack of diversity or inclusivity;

- Choosing Ms. Betts (Caucasian) over Mr. Robinson to lead decision making for the digital department after the team won a landmark project, even though Mr. Robinson was more qualified and experienced for the role (and ultimately had to take it over and fix the problems created by Ms. Betts when Ms. Betts was asked to stop down);

- Effectively demoting Mr. Robinson by removing his supervisory authority when his direct reports all began reporting to Ms. Betts;

- Paying Mr. Robinson (the only Black executive at the time) the lowest salary of all the executives;

- Paying Mr. Robinson less than some Caucasian non-executive employees;

19

- Giving Mr. Robinson a raise in an (alleged) effort to bring him in line with his Caucasian counterparts, which still left him earning approximately $35,000 less than his Caucasian counterparts;

- Ms. Silinas telling Mr. Robinson they would "figure out a plan" for his exit when Mr. Robinson had expressed no desire to fully exit; and

- Terminating Mr. Robinson's employment.

95.    Non-African-American/Black employees were not subjected to similar treatment.

96.    In addition to the above, Yes& has demonstrated a pattern and practice of

discriminating against its African American/Black employees, and other employees of color.

- Rynnel Laughlin (African-American/Black), VP Account Management, told Mr. Robinson she felt devalued, and "othered" (not being accepted or fitting in at the company), and positioned within the company because of her race and gender.

- After Mr. Robinson's termination, Ms. Laughlin was immediately put in front of a client because the potential client reacted poorly to Mr. Robinson's termination. Ms. Laughlin knew what was happening, and said it made her feel like a "tap-dancing Negro."

- In April/May 2024, Celeste Morrison, a transgender woman, was hired as VP of Engineering. Mr. Brown made comments (more than once) that, "We have to be careful because she is a Maverick [on the Predictive Index Behavioral Assessment designation] and they don't make good leaders. We need to watch out for her. She's a trouble-maker."  In sharp contrast, three Caucasian senior executives also received "Maverick" designations and they were some of the highest paid individuals at the company.  Mr. Brown did not issue a warning that the other, non-minority executives who were also "Mavericks" were "trouble makers," not good leaders, or that others should "watch out" for them.

- Mr. Brown often referred to Ms. Morrison as a "he/she," a "him," a "dude woman," or "whatever else the hell they want to be called." The same week Mr. Robinson was told Ms. Morrison needed to be fired, he had just written her 30 or 60 day review which was an overall very positive review, but he was instructed not to submit her review to HR because that would make her firing "problematic."

- Brianna Lawson (African-American/Black/LGBTQ+) was a senior copywriter, specially assigned to the US Mint account to demonstrate diversity.  While working on the account, a member of the client team made several homophobic remarks (witnessed by other Yes& employees), but Yes& took no action to support Ms. Lawson, or address it with the client, and forced her to remain on the account.

20

97.     Defendant was motivated to treat Mr. Robinson in a disparate manner and to discriminate against him because of his race, and such discriminatory treatment of Mr. Robinson was in violation of the Virginia Human Rights Act, as amended in July 2020 by the Virginia Values Act (Senate Bill 868), codified at Va. Code § 2.2-3900, *et seq.*

98.     In discriminating against Mr. Robinson in violation of the law, Defendant evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Mr. Robinson.

99.     Each of the above acts constitutes discrimination and created a hostile work environment.

100.    Mr. Robinson has suffered and continues to suffer emotional distress and physical injury.  Such injury includes pain, suffering, inconvenience, mental anguish, embarrassment, humiliation, decreased self-esteem, loss of confidence, stress, fearfulness, stress and anxiety, loss of enjoyment of life, withdrawal from social interaction, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

101.    Due to the conscious disregard for Plaintiff's statutorily protected rights, and the severity of Defendant's conduct, Plaintiff is also entitled to punitive damages.

### COUNT THREE - BREACH OF CONTRACT
**(Employment Agreement)**

102.    The allegations of the foregoing paragraphs are incorporated in this count as if they were repeated here in full.

21

103.   The Employment Agreement sets forth the terms of Mr. Robinson's employment.

104.   The Employment Agreement constitutes a contract between Mr. Robinson and Yes&.

105.   Yes& breached its Agreement with Mr. Robinson by terminating Mr. Robinson prior to the expiration of his Term, with no notice. The termination notice did not state that Mr. Robinson was terminated For Cause, and Mr. Robinson had not engaged in any of the conduct giving rise to a for Cause termination.

106.   As a direct and proximate result of the breaches by Yes&, Mr. Robinson has suffered and continues to suffer damages including the specific amounts due as set forth above, loss of use of income; loss of opportunities and benefits; and other past and future pecuniary losses.

## **PRAYER FOR RELIEF**

WHEREFORE, ANTHONY ROBINSON requests that this Court enter judgment in his favor against Defendant YES& HOLDINGS, LLC a/k/a YES& AGENCY, and to act further as follows:

a)   Award Mr. Robinson compensatory damages, plus demonstrated past and future pecuniary damages on the above-stated Counts One, Two, and Three; and in addition

b)   Award punitive damages to Mr. Robinson on Counts One and Two in the amount of $350,000 (the statutory cap in Virginia); and in addition

c)   Award injunctive relief consisting of an order prohibiting Defendant from engaging in further employment practices that create or tolerate a discriminatory work environment; and in addition

d) Award Mr. Robinson his costs, including but not limited to reasonable attorneys' fees, plus any expert witness fees, and in addition

e) Award Mr. Robinson such other and further relief as may be appropriate.

## JURY DEMAND

**PLAINTIFF ANTHONY ROBINSON DEMANDS A TRIAL BY JURY.**

April 30, 2025                    Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, VSB No. 44803
CHARLSON BREDEHOFT COHEN
 BROWN & NADELHAFT, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, Virginia 20190
(703) 318-6800 Telephone
(703) 318-6808 Facsimile
*Counsel for Plaintiff, Anthony Robinson*

23