IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ANTHONY ROBINSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:25-cv-734 (RDA/IDD) |
| | ) |
| YES& HOLDINGS, LLC | ) |
| a/k/a YES& AGENCY, | ) |
| | ) |
| Defendant. | ) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This matter comes before the Court on Defendant Yes& Holdings' Motion to Dismiss Plaintiff's Complaint in its Entirety. Dkt. 5. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). These matters have been fully briefed and are now ripe for disposition. Considering the Motion together with the Complaint (Dkt. 1), the Memorandum in Support (Dkt. 6), Plaintiff's Opposition (Dkt. 11), and Defendant's Reply (Dkt. 14), this Court GRANTS the Motion to Dismiss for the reasons that follow.

I. BACKGROUND
A. Factual Background[1]

Defendant is an independent marketing agency serving clients in a variety of sectors, including commercial, association, B2G, higher education, not-for-profit, and government. Dkt. 1 ¶ 3. Plaintiff was an employee of Defendant. *Id.* ¶ 4.

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

On November 1, 2021, P'unk Ave, a 25-person digital agency, was acquired by Defendant, a 180-person agency. *Id.* ¶18. Plaintiff was CEO of P'unk Ave at the time, with 3% ownership. *Id.* As a result of the acquisition, on November 1, 2021, Plaintiff entered into an Employment Agreement with Defendant for the position of Senior Vice President ("SVP"), Digital Strategy, reporting directly to Jeb Brown, Chairman and COO of Defendant. *Id.* ¶ 19.

Pursuant to the Employment Agreement, the Term of Mr. Robinson's employment was as follows:

> **Term**. Subject to the provisions contained in Sections 6 and 7, the Executive's employment pursuant to this Agreement by the Company shall be for a term commencing on the Effective Date and expiring on the close of business on March 31, 2024 (the "**Initial Term**"); provided, however, that if, on or before December 31, 2022, the parties mutually agree to extend the Initial Term, the Initial Term shall be extended to December 31, 2025; and further provided, that the Executive's employment by the Company shall continue for an indefinite period after the conclusion of the Initial Term unless and until either Party shall give to the other 90 days' advance written notice of termination (a "**Notice of Termination**") specifying the termination date, which shall not be less than ninety (90) days after the date on which the Notice of Termination is given.

*Id.* ¶ 20 (emphasis in original).

Also on November 1, 2021, Plaintiff was asked to sign a Protective Covenants Agreement as a condition of employment. *Id.* ¶ 21.

In his role as SVP, Digital Marketing, Plaintiff maintained his role as the head of digital, but shared his responsibilities with another executive, Tracy Betts, who came to Defendant from another small firm that had been recently acquired by Defendant. *Id.* ¶ 22. Plaintiff also maintained his prior level of compensation, and in addition, received Long Term Incentive Plan shares from Defendant which vested yearly. *Id.*

Defendant has an aggressive mergers and acquisitions strategy, and a track record of acquiring smaller firms and asking employees who wish to remain employed to quickly sign new employment agreements and restrictive covenants, with minimal time to review. *Id.* ¶ 23. Plaintiff

2

was given less than four days to review and sign his agreements, a concern he communicated in writing to Defendant's leadership. *Id.* ¶ 24.

From the start of his employment until two and a half years later, when Robb Lee joined Defendant in August 2023, Plaintiff was the only African-American executive. *Id.* ¶ 25. After the acquisition, Plaintiff lost most of his former staff, and worked to rebuild the digital team from scratch. *Id.* ¶ 26. Plaintiff received an increase in his compensation during this time. *Id.*

The core executive team group was expected to be the face of the company. *Id.* ¶ 27. Each had their own department, but, when it came to things Brown deemed as "serious," Brown excluded Plaintiff, but included the other, Caucasian, executives. *Id*. Caucasian executives would also travel across the country to meet other potential partners or executives, or vet a new service. *Id.* ¶ 28. Brown would not send Plaintiff on travel, even if the service or partnership fell directly under Mr. Robinson's area of expertise (digital/higher education/non-profit). *Id.* Plaintiff perceived, however, that, if having a Black executive was beneficial to Defendant, Brown would present Plaintiff to the client or potential client. *Id.*

In 2022, Defendant had the potential to win a huge account with the US Mint. *Id.* ¶ 29. The US Mint wanted a fresh perspective for selling specialized coins and wanted to expand the base of its customers to BIPOC (Black, Indigenous, and People of Color), LGBTQ+, and younger generations. *Id.* The pitch team, led by CEO Robert Sprague (Caucasian), tapped Plaintiff and Louis Maldonado (Latino) to represent their perspective on advertising to diverse audiences. *Id.* ¶ 30. Plaintiff and Maldonado presented their pitch to the client and won the account, which was a contract worth over $1,000,000+ annually. *Id.* During the course of working with Maldonado, Plaintiff learned that he was a minority shareholder (as Plaintiff had been at P'unk Ave) in a company that was considering partnering with Defendant, such that Defendant would own

3

approximately 40% of the company. *Id.* ¶ 31. After Defendant won the project, Maldonado and Plaintiff were not invited to the account to participate in servicing the client and the account team did not follow the inclusive perspective and strategy created by Plaintiff and Maldonado. *Id.* ¶ 32. Plaintiff alleges that this happened on other occasions as well and that, when the account suffered, they would reach out to Plaintiff, Mr. Maldonado (or other people of color at Yes&) to be added to the account. *Id.* ¶ 33.

Maldonado and Plaintiff pitched several things together after that but because of this experience with Brown, Maldonado recommended to his fellow shareholder partners that they should not proceed with the acquisition by Defendant. *Id.* ¶ 34.

Thereafter, Plaintiff's team began to win some large projects and, in the July/August 2022 timeframe, Plaintiff's team won a landmark project. *Id.* ¶ 35. However, Plaintiff and Betts soon began having conflict as the two heads of the digital department. *Id.* Eventually, Brown told Plaintiff that he only wanted "one hand on the steering wheel" for decision-making for the digital department and he had chosen Betts over Plaintiff. *Id.* ¶ 36. Betts is Caucasian. *Id.* Plaintiff asserts that Betts was not as qualified or experienced for the role as Plaintiff and should not have been selected over him. *Id.* Although not a financial "demotion," Plaintiff alleges that this was still a demotion and was viewed as such by his colleagues. *Id.* ¶ 37. Plaintiff alleges that there was no basis to remove him from a position of supervisory authority. *Id.* ¶ 38.

After Brown announced his decision to effectively promote Betts over him, Plaintiff asked to meet with Brown. *Id.* ¶ 39. As a result of that conversation, Plaintiff transitioned to a compensation structure that recognized his sales performance and rewarded his new focus on digital new business and accounts. *Id.* The new structure provided for an approximate bi-annual performance bonus worth a maximum of $15,000 - $20,000 for each half of the year. *Id.*

In October 2022, Plaintiff received another raise, after Brown accidentally sent him (and two other employees) a profitability spreadsheet containing salary information, and Plaintiff learned that not only was he the lowest paid executive, but there were even non-executives earning more than he was. *Id.* ¶ 40. This only served to verify Plaintiff's view of his situation. *Id.* After he saw the information, Plaintiff was given a raise in an effort to bring his compensation in line with his Caucasian counterparts, but Plaintiff does not believe this would have occurred if Brown had not inadvertently sent Plaintiff the salary information. *Id.* ¶ 41. Even after his raise, the pay difference between Mr. Robinson and Caucasian executives was still about $35,000. *Id.*

In August 2023, it became apparent that Brown had made the wrong decision in appointing Betts as head of digital, and Betts was asked to step down from her position. *Id.* ¶ 43. She ultimately departed Defendant, and, by September 2023, Plaintiff had resumed the role as head of digital. *Id.* There were problems in the department as a result of Betts's leadership. *Id.* ¶ 44.

In 2023, Plaintiff was introduced to Janelle Coy and her company, Spero. *Id.* ¶ 46. Brown thought it would be a good idea if Plaintiff and Coy worked together, which Plaintiff perceived to be because they are both African-American/Black. *Id.*

In late March or early April 2024, Plaintiff met with Brown and communicated his desire to own his own agency, asking for the support of Defendant to achieve that goal. *Id.* ¶ 47. Plaintiff described his vision of his agency – The Devoted Agency – and Brown expressed his excitement to support Plaintiff in that endeavor. *Id.* ¶ 48. In fact, Brown expressed interest in investing or even becoming a minority partner. *Id.* They agreed that Plaintiff could start up The Devoted Agency and run it concurrently with his duties at Defendant (reducing his time at Defendant to four days each week), and they would "see how things go," reassessing on a month-to-month basis, to ensure Plaintiff's responsibilities at Defendant were being fulfilled. *Id.*

5

In May 2024, Defendant announced the imminent hire of a new COO, Zihla Silinas (Caucasian), to replace Brown, who wanted to exit by the end of 2024. *Id.* ¶ 49. At the same time, it was announced that Defendant was identifying potential partners for a strategic acquisition, minority sale, or ESOP to assist with the owner's exit. *Id.*

During a meeting with Silinas at the beginning of June 2024, Silinas asked about Plaintiff's 30hr/week agreement and suggested they "figure out a plan" for his exit. *Id.* ¶ 50. Plaintiff responded that he was not interested in making a full exit at that time because of the announcement of the sale and stated that he would continue to fulfill his responsibilities until (at a minimum) the conclusion of the sale. *Id.* Brown, who was also present, responded, "Don't worry Anthony, we are going to take care of you no matter what. Before or after the sale. Let's just figure this out." *Id.* ¶ 51.

During the week of June 15, 2024, Plaintiff was summoned to a 1:1 meeting with Silinas at which time she notified Robinson that Defendant had learned that his colleague and co-worker, Nicole Glueckert, was working at Mr. Robinson's new company – The Devoted Agency – and, because of that, Plaintiff was in violation of his non-solicitation agreement with Defendant. *Id.* ¶ 52. Silinas offered Plaintiff two options: (1) termination For Cause (for his alleged violation of his non-solicitation provision); or (2) removal from the Executive Team and with status as a consultant working on new business and continuing to work with his current clients for 15-20 hours/week @ $125/hr., with payment of half of his performance bonus ($7,500) and payout of his LTIP shares ($6,250). *Id.* ¶ 53. Plaintiff declined to accept either of the options presented to him, and shortly thereafter, responded to Defendant. *Id.* ¶ 54.

After that, on June 28, 2024, Plaintiff received notice of his termination via email. *Id.* ¶ 55. The email notice purported to terminate his employment without notice or severance, in

6

violation of the terms of his Employment Agreement. *Id.* The termination notice incorrectly stated that the term of Plaintiff's employment expired on March 31, 2024, because "there was no mutual agreement to modify of extend it." *Id.* ¶ 56. However, rather than terminating on March 31, 2024, the Employment Agreement states in Section 2t: "[T]he Executive's employment by the Company shall continue for an indefinite period after the conclusion of the Initial Term unless and until either Party shall give to the other 90 days' advance written notice of termination (a 'Notice of Termination') specifying the termination date, which shall not be less than ninety (90) days after the date on which the Notice of Termination is given." *Id.* ¶ 57. Defendant did not provide Plaintiff with ninety (90) days' notice of his termination. *Id.* ¶ 58. The termination email notice also attempted to assert that Brown and Plaintiff "modified" the Employment Agreement with new terms. *Id.* ¶ 59.

Prior to his termination, Plaintiff had discussed his transition to his new agency, The Devoted Agency, and Defendant, through Brown, had agreed to support this transition. *Id.* ¶ 62. Indeed, Defendant requested that Plaintiff make several joint proposals for client work and announced its support for this endeavor in writing to Defendant's employees. *Id.*

In addition, upon any termination other than For Cause, as defined in the Employment Agreement, Plaintiff was entitled to the severance benefits provided under Section 7(b) (six months). *Id.* ¶ 64. The termination notice provided by email on June 28, 2024, does not explicitly assert that Mr. Robinson was terminated For Cause. *Id.* ¶ 65.

Notably, on the day of his termination, Plaintiff reminded Defendant that should it believe (even incorrectly) that he had somehow violated an obligation to the company or otherwise violated any other provision of the terms of his employment, Defendant was required to provide him with fourteen (14) days' written notice specifying in reasonable detail the nature of the claimed

7

breach and the manner in which the company required such breach to be cured. *Id.* ¶ 66. Such a notice and opportunity to cure was not provided. *Id.* ¶ 67. In addition, Plaintiff also gave notice to Human Resources on June 28, 2024, that if there was any concern regarding his work with The Devoted Agency, which had previously been approved, he would work to address and cure whatever concerns the company had. *Id.* ¶ 69.

Plaintiff specifically alleges that, on the day of his termination, he shared his desire for a mutually satisfactory path forward and that "Yes&'s subsequent actions appear to be a premeditated effort to terminate Mr. Robinson's employment prior to the upcoming sale in order to avoid having Mr. Robinson share in the rewards of his efforts." *Id.* ¶ 73.

Plaintiff asserts that Defendant also breached the terms of the Asset Purchase Agreement ("APA") for the Merger, including by failing to provide Plaintiff with the Earnout Statements required under Section 2.5, despite his request for this information, and taking other steps inconsistent with the parties' agreement post-Merger. *Id.* ¶ 74. Plaintiff alleges that this "strongly suggest[s] that these actions were undertaken in order to avoid paying out that portion of the Purchase Price owed." *Id.*

Plaintiff further alleges that other African American/Black employees have also been discriminated against. *Id.* ¶ 76. Plaintiff asserts that Rynnel Laughlin ("Ms. Laughlin") (African-American/Black), VP Account Management, expressed feeling devalued, and "othered" (not being accepted or fitting in at the company), because of her race and gender. *Id.* ¶ 77. After Plaintiff's termination, Laughlin was immediately placed before a client, and she said it made her feel like a "tap-dancing Negro." *Id.* Plaintiff further asserts that, in April/May 2024, Celeste Morrison, a transgender woman, was hired as VP of Engineering. *Id.* ¶ 78. After she was hired, it became clear that Brown did not like her, and Brown made comments (more than once) that, "We have to be

careful because she is a Maverick [on the Predictive Index Behavioral Assessment designation] and they don't make good leaders. We need to watch out for her. She's a trouble-maker." *Id*. In sharp contrast, three Caucasian senior executives also received "Maverick" designations, and they were some of the highest paid individuals at the company. *Id.* ¶ 79. Brown often referred to Morrison as a "he/she," a "him," a "dude woman," or "whatever else the hell they want to be called." *Id.* ¶ 80. Brianna Lawson (African-American/Black/LGBTQ+) was a senior copywriter, assigned to the US Mint account. *Id.* ¶ 81. While working on the account, a member of the client team made several homophobic remarks (witnessed by other employees), but Defendant took no action to support Lawson, or address it with the client. *Id.*

Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on or about September 26, 2024. *Id.* ¶ 15. On March 20, 2025, the EEOC issued a Right to Sue letter. *Id.* ¶ 16.

### B.  Procedural Background

On April 30, 2025, Plaintiff filed his Complaint alleging three counts: (i) discrimination and a hostile work environment under Title VII of the Civil Rights Act of 1964 ("Title VII"); (ii) discrimination and a hostile work environment under the Virginia Human Rights Act (the "VHRA")/Virginia Values Act; and (iii) breach of contract. Dkt. 1. On May 28, 2025, Defendant filed its Motion to Dismiss. Dkt. 5. On June 18, 2025, Plaintiff filed his Opposition. Dkt. 11. On July 1, 2025, Defendant filed its Reply. Dkt. 14.

## II.  STANDARD OF REVIEW

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleaded factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion brought under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). "[T]he court 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)). Additionally, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Generally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion. *See Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

III. ANALYSIS

Defendant seeks to dismiss each of Plaintiff's claims under Title VII, under the VHRA, and for breach of contract.[2] The Court addresses each argument in turn below.[3]

---

[2] Defendants correctly note that there are two stray references in the Complaint to 42 U.S.C. § 1981. Dkt. 1 at 1 and ¶ 7. Nonetheless, none of the counts in the Complaint rely on Section 1981. Because Plaintiff is represented by counsel and because the counts of the Complaint do not rely on Section 1981, the Court does not construe the Complaint as attempting to assert a Section 1981 claim.

[3] As a preliminary matter, the Court notes that Defendant argues that Plaintiff's Complaint constitutes a shotgun pleading. Dkt. 6 at 13-14. Although the Complaint certainly has elements of a shotgun pleading – namely grouping together causes of actions like a discrete discrimination claim and a hostile work environment claim in one count without distinguishing which allegations pertain to which legal theory – the Court does not find that the pleading is so burdensome or so difficult that Defendant is unable to respond. Therefore, the Court declines Defendant's invitation to strike the Complaint.

      A.      Title VII/VHRA Hostile Work Environment Claim

To begin with, the Court will analyze Count 1 (Title VII hostile work environment claim) and Count 2 (VHRA hostile work environment claim) together, because Title VII and the VHRA use substantially identical language. *See, e.g.*, *Rose-Stanley v. Virginia*, 2015 WL 6756910, at *4 (W.D. Va. Nov. 5, 2015) (noting that, because plaintiff "has not stated any viable claim under federal law, she cannot claim an unlawful discriminatory practice under the VHRA"); *see also McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024) (recognizing that Title VII and VHRA claims are analyzed together "because Title VII and the VHRA use substantially identical language").

To state a hostile work environment claim, Plaintiff must allege sufficient facts to show that the alleged conduct he experienced was: (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment; and (4) imputable to his employer. *See Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495-96 (4th Cir. 2015). Stated differently, a plaintiff must plausibly plead that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). There is no precise formula for determining whether a work environment is "abusive" or "hostile"; such a determination can be made "only by looking at all the circumstances." *Id.* at 23.

Plaintiff fails to allege that any conduct that he experienced created an environment that was so infected with racial animus that it altered his conditions of employment and created an abusive working environment. In short, Plaintiff attempts to reframe his allegations of discrete

11

acts of discrimination and attempts to combine them to create a race-based hostile work environment. But Plaintiff's allegations of different treatment are vague, conclusory, and do not establish an abusive environment or clear the high bar set for hostile work environment claims. Here, Plaintiff was employed between 2021 and 2024. Over that time, he alleges that he was excluded from strategic meetings. Dkt. 1 ¶ 27. But Plaintiff does not include allegations regarding frequency, any allegations regarding dates of said meetings, or any other information to make this more than a vague reference to exclusion. *See Pritchard v. Metro. Washington Airport Auth.*, 2019 WL 5698660, at *5, *11 (E.D. Va. Nov. 4, 2019) (denying retaliatory hostile work environment claim where plaintiff claimed to have been excluded from meetings). Similarly, Plaintiff's allegations regarding travel and presentations are vague and conclusory. Dkt. 1 ¶ 28. And Plaintiff does not allege that he was excluded from <u>all</u> such travel, rather he alleges that he travelled or involved in presentations where his presence was viewed as helpful to the company. *Id.* Thus, Plaintiff simultaneously complains that he was included and excluded but provides no clear details about either nor explains why he views this as being based on his race. *See, e.g.*, *Manning v. Southwestern Bell Mobile Sys.*, 1992 WL 170552, at 5 (N.D. Ill. July 15, 1992) (recognizing that "Title VII does not provide a cause of action for tokenism for the beneficiary of that tokenism"). Plaintiff alleges that he raised concerns regarding marginalization (Dkt. 11 at 20), but the cited portions of the Complaint do not support such allegations (Dkt. 1 ¶¶ 31-33). Furthermore, Plaintiff's alleged discrete acts of discrimination are not sufficient to establish a hostile work environment. *See, e.g.*, *Ali v. FC Architects Eng'rs, PLC*, 832 F. App'x 167, 172 (4th Cir. 2020) (holding that, even where such actions are "racially tinged," a demotion is not sufficiently severe or pervasive to "create an abusive environment"); *Petrosyan v. Delfin Grp. USA LLC*, 2014 WL 5488419, at *6 (D.S.C. Oct. 29, 2014) ("While Plaintiff does set forth some specific factual

allegations that Gordon demoted him and replaced him with a less experienced employee, that even is not 'extreme' conduct sufficient to establish the requisite severe and abusive conduct required for a hostile work environment.").

Plaintiff cites to *McIver v. Bridgestone Americas, Inc.*, 42 F. 4th 398 (4th Cir. 2022), which only demonstrates how Plaintiff's claims fall short. Dkt. 11 at 18. Notably, in *McIver*, the Fourth Circuit found that the plaintiff had not established a race-based hostile work environment. 42 F. 4th at 410 ("The totality of these allegations, and the evidence put forward to support them, fails to create a genuine question of material fact that racial discrimination . . . ."). Importantly, in *McIver*, the Court recognized that a "plaintiff cannot rely on h[is] own 'conjecture' to impute a racial character to what appears to be neutral harassment." *Id.* at 409 (citing *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280–81 (4th Cir. 2000)). Here, Plaintiff alleges he was the only African-American executive, and none of the conduct upon which he premises his claims have an overtly racial character. Thus, Plaintiff has failed to establish that race-based decision-making is a reasonable inference. This is especially true where it is unclear who the decision-maker is for matters like travel. Moreover, unlike other cases where a plaintiff may be hired into a position with a specific salary range; here, Plaintiff's position was negotiated as part of the acquisition of his company. This further undercuts any inference of a race-based hostile work environment. *See, e.g.*, *Staley v. Gruenberg*, 2013 WL 12096490, at *13 (E.D. Va. May 10, 2013) (finding that "Plaintiff merely speculates with boilerplate allegations that Defendant's conduct resulted from its animus toward a protected group"); *Hector v. Wolf*, 2020 WL 7265848, at *7-8 (E.D. Va. Dec. 10, 2020) (dismissing hostile work environment claim where there "are no supporting allegations demonstrating that plaintiff's perception was reasonable, why plaintiff perceived [a] comment this way," *etc.*). There are thus no factual allegations which move Plaintiff's assertions of race

13

discrimination from *possible to plausible*. *See Burnette v. Fahey*, 687 F.3d 171, 186 (4th Cir. 2012) (noting that the *Iqbal* and *Twombly* pleading standard requires plaintiff's to "allege facts demonstrating a plausible, not merely possible, entitlement to relief").

In short, Plaintiff has failed to allege sufficient facts to plausibly state a race-based hostile work environment under either Title VII or the VHRA, and the Motion will be granted in this regard. *See Dawson v. Rumsfeld*, 2006 WL 325867, at *4 (E.D. Va. Feb. 8, 2006) (granting motion to dismiss where "[t]he vast majority of Plaintiff's allegations involve administrative actions that facially bear no relation to Plaintiff's race").

### B.     Title VII/VHRA Disparate Treatment Claim

For the same reason noted *supra*, the Title VII and VHRA disparate treatment claims will be analyzed together. As Plaintiff clarifies in his Opposition, Plaintiff's disparate treatment claim is premised on his discharge. *See* Dkt. 11 at 11. Plaintiff asserts that to state a plausible claim for discrimination he must allege: "(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) disparate treatment compared to similarly-situated employees outside the protected class." Dkt. 11 at 12 (citing cases).[4,5]

---

[4] Thus, based on Plaintiff's Opposition, it is clear that Plaintiff is attempting to demonstrate the plausibility of his claim by establishing a *prima facie* case of discrimination. Of course, Plaintiff is not required to establish a prima facie case to state a claim. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-15 (2002) (noting that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement"). Plaintiff is, however, required to allege facts that "nudge" his claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680. In other words, Plaintiff is required to allege facts from which one could reasonably infer discrimination (or retaliation). *See Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x 167, 171 (4th Cir. 2020) (discussing whether allegations are sufficient to support a reasonable inference of discrimination sufficient to support a motion to dismiss). Plaintiff, here, has chosen to do that through the *prima facie* case.

[5] The Court does not consider Defendant's resignation argument as it is based on matters outside of the Complaint and not appropriately considered on a motion to dismiss.

14

Plaintiff's complaint here has fails in two respects.  First, Plaintiff alleges that the decision-maker with respect to his termination was Silinas, who only joined Defendant in 2024.  Thus, none of the prior conduct that Plaintiff alleges to be discriminatory can be attributable to her (which all occurred under Brown).  And Plaintiff alleges no facts regarding Silinas's behavior from which one could infer racial animus.  Plaintiff's allegations of race discrimination related to his discharge appear to be based on nothing more than "naked assertions," which are insufficient to survive a motion to dismiss.  *Harris v. Wormuth*, 2023 WL 6149071, at *5 (E.D. Va. Sept. 20, 2023), *aff'd,* 2024 WL 2362171 (4th Cir. May 23, 2024) (citing *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 588 (4th Cir. 2015)).  Further undermining any allegation of racially discriminatory discharge are Plaintiff's allegations that he was terminated so that Defendant would not have to share profits with him.  Dkt. 1 ¶ 73 (alleging conduct "appear[s] to be a premeditated effort to terminate Mr. Robinson's employment prior to the upcoming sale in order to avoid having Mr. Robinson share in the rewards of his efforts"); *id.* ¶ 74 (suggesting "that these actions were undertaken in order to avoid paying out that portion of the Purchase Price owed Mr. Robinson and his previous partners arising from the Earnout Period calculations").  The lack of factual allegations supporting the naked assertion of a race-based discharge fails to support a reasonable inference of race discrimination.

Second, to the extent Plaintiff seeks to rely on similarly situated comparators, it is important to note that those comparators must be "similarly situated *in all material respects*."  *Tinsley v. City of Charlotte*, 854 F. App'x 495, 500 (4th Cir. 2021) (emphasis added).  Plaintiff alleges nothing about the individuals against whom he seeks to compare himself other than that they are Caucasian and they are executives – he does not even attempt to identify any such comparator.  Moreover, Plaintiff's arguments regarding similarly situated comparators relates back

15

to his treatment with respect to travel and meetings (Dkt. 11 at 16) and *not* the discharge upon which his discrimination claim was premised. Here, Plaintiff is alleged to have breached a nonsolicitation provision in his employment agreement; thus, a similarly situated comparator might be one who was alleged to have violated a similar provision of an employment contract and was not terminated.

In short, Plaintiff has failed to allege sufficient facts to support a reasonable inference that his discharge was tainted by race discrimination, and the Motion will be granted in this regard.

C. Breach of Contract Claim

The elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *White v. Trans Union LLC*, 2025 WL 409660, at *4 (E.D. Va. Feb. 5, 2025) (citing *NAC Consulting, LLC v. 3Advance, LLC*, 650 F. Supp. 3d 441, 447 (E.D. Va. 2023)). Here, Defendant challenges whether Plaintiff can establish damages where Plaintiff breached the contract first. Plaintiff cannot.[6]

Here, the relevant Employment Agreement prohibits Plaintiff from, "during the Term of his employment and for a period of two (2) years thereafter, solicit[ing] for employment, employ[ing], or attempt[ing] to employ, as an employee or retain, or attempt to retain, as a consultant, any Restricted Personnel or, persuade or attempt to persuade any Restricted Personnel to leave the employ of the Company or the Yes& Group or to become employed as an employee

---

[6] Plaintiff did not attach the relevant employment agreement to his Complaint. Dkt. 1. To be sure, the contract that forms the basis for the breach of contract claim is incorporated by reference into the Complaint and may be considered when attached to a motion to dismiss. *See Fayetteville Invs. v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) (approving consideration of performance bond and construction contract upon motion to dismiss because they were incorporated by reference into the complaint).

16

or retained as a consultant by any other Person." Dkt. 6-1 § 8(b)(iii). "Restricted Personnel" include any "employee" of Defendant. *Id.* § 8(a)(vii). Further, the Employment Agreement provides that, if Plaintiff breaches this provision, he forfeits "*any* rights to *any* payments that may otherwise be *due and owing* to him under this Agreement." *Id*. § 8(d) (emphasis added). Here, Plaintiff has alleged that he employed at his own company, The Devoted Agency, a "colleague and co-worker, Nicole Glueckert." Dkt. 1 ¶ 52. Thus, Plaintiff has alleged his own first material breach of the Employment Agreement.

Plaintiff argues that Section 8(d) of the Employment Agreement only applies to "forfeiture of certain future payments." Dkt. 11 at 23. But that does not comport with the plain language of the contract, which specifically refers to payments "due and owing" under the Employment Agreement. Dkt. 6-1 § 8(d). Thus, in alleging his hiring of a coworker at The Devoted Agency, Plaintiff has alleged a breach of contract that, under Section 8(d), deprives him of a right to "*any* payments." *Id.* (emphasis added). Accordingly, the Motion will be granted in this regard.[7]

## IV.   CONCLUSION

Because Plaintiff has failed to plausibly allege a hostile work environment, discriminatory discharge, or breach of contract claim, the Court will dismiss the Complaint. Although the Court will grant the Motion, the Court cannot say at this stage that amendment would be futile. Accordingly, Plaintiff will be provided one opportunity to amend.

Accordingly, it is hereby ORDERED that the Motion to Dismiss (Dkt. 5) is GRANTED; and it is

---

[7] The conclusion reached here is also consistent with the principle of Virginia law that "a party who commits the first [material] breach of a contract is not entitled to enforce the contract." *Horton v. Horton*, 254 Va. 111, 115 (1997).

FURTHER ORDERED that the Complaint (Dkt. 1) is DISMISSED without prejudice; and it is

FURTHER ORDERED that, if Plaintiff seeks to amend his Complaint, he is DIRECTED to file any amended complaint on or before <u>Monday, March 27, 2026</u>.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all parties.

It is SO ORDERED.

Alexandria, Virginia  
March 5, 2026

/s/  
Rossie D. Alston, Jr.  
United States District Judge